SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY et al., | Case No. 08-13141 (KJC)<br>Jointly Administered |
| Debtors. | |

---

WILMINGTON TRUST COMPANY, as Successor
Indenture Trustee for the Exchangeable Subordinated
Debentures due 2029,

      Plaintiff,

v.

      Adv. No. _____

JP MORGAN CHASE BANK, N.A.,
individually and as Administrative Agent, J.P.
MORGAN SECURITIES INC.,
MERRILL LYNCH CAPITAL CORPORATION,
individually and as Administrative Agent,
MERRILL, LYNCH, PIERCE, FENNER & SMITH
INCORPORATED,
CITICORP NORTH AMERICA, INC.,
individually and as Administrative Agent,
CITIBANK, N.A., CITIGROUP GLOBAL
MARKETS, INC., BANK OF AMERICA, N.A.,
BANC OF AMERICA SECURITIES, LLC,
BARCLAYS BANK PLC, and
MORGAN STANLEY & CO. INC.,

      Defendants.

---

## COMPLAINT FOR EQUITABLE SUBORDINATION AND DISALLOWANCE OF CLAIMS, DAMAGES, AND CONSTRUCTIVE TRUST

Plaintiff, Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee

for the Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of

approximately $1.2 billion (the "PHONES"), issued in April 1999 pursuant to an indenture (the

"Indenture"), by Debtor Tribune Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors"),[1] by and through its undersigned counsel, hereby files this Complaint for equitable subordination and disallowance of claims, damages, and imposition of a constructive trust against property of the defendants as follows:

## I. PRELIMINARY STATEMENT

1.      This action arises out of the 2007 failed leveraged buyout ("LBO") of Tribune.

2.      By this action, Wilmington Trust seeks: equitable subordination to the claims of the PHONES of all claims of defendants arising from the LBO; disallowance of all claims of defendants arising from the LBO; damages against Citibank, N.A. ("Citibank"), for its breach of its fiduciary duty as the indenture trustee to the PHONES during the LBO; damages and equitable subordination against the other defendants for aiding and abetting Citibank's breach of fiduciary duty; and the imposition of a constructive trust over the property obtained by the defendants arising from the LBO.

3.      The PHONES were the particular target and victims of the scheme between Tribune and defendants Citigroup Global Markets, Inc. ("CGMI"), Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), JP Morgan Chase Bank ("JPMCB") and J.P. Morgan Securities ("JPMS") (collectively, "JP Morgan"), and Bank of America, N.A. ("Bank of America"), (collectively, the "Lead Banks"), in which the other defendants actively participated, to structure and execute the LBO in a manner that both Tribune and the Lead Banks foresaw would render Tribune insolvent and, ultimately, drive it into bankruptcy, all at the expense of the PHONES, holders of an approximately $1 billion investment in Tribune.

---

[1] The Debtors in these Chapter 11 Cases are listed on Exhibit A to this Complaint.

4.      Prior to the LBO, at any reasonable enterprise value, Tribune was more than able to support its existing senior bank debt of $2.8 billion, senior unsecured notes of $1.3 billion, and the PHONES debt of $1.2 billion.  Of Tribune's total pre-existing debt just prior to the LBO, $4.1 billion was senior in priority to the PHONES.

5.      The LBO fundamentally changed Tribune's capital structure in order to:  (a) meet the demands of major shareholders of Tribune that they be cashed out; and (b) transfer control of Tribune to Samuel Zell ("Zell"), a Chicago real estate developer.  To accomplish these purposes, Tribune obligated itself to buy out all of its existing shareholders, increased its total debt to over $13 billion (almost tripling its prior debt load) to finance the LBO ("LBO Debt" or "LBO Loans"), and caused most of its subsidiaries (the "Guarantors")[2] to guarantee that debt.  Prior to the LBO, Tribune's ratio of indebtedness to EBITDA was 4.8:1.  After the LBO, it skyrocketed to 11.8:1.  The obligations assumed in connection with the LBO rendered Tribune and the Guarantors insolvent at all relevant times and caused the amount of debt senior to the PHONES to increase from $4.1 billion to $11.3 billion.  The LBO was a single integrated transaction that was completed in two steps:  "Step One," which closed in June 2007, and "Step Two" which completed the LBO in December 2007.  Less than one year after the completion of the two-step LBO, unable to carry the massive burden of the LBO Debt, Tribune and most of the Guarantors filed for relief under the Bankruptcy Code on December 8, 2008 (the "Petition Date").

6.      Neither Tribune, its creditors nor the Guarantors benefited from incurring the LBO Debt.  Pursuant to a plan of merger and merger agreement entered into on April 1, 2007, (collectively the "Merger"), over $8 billion of the LBO Loans was paid to the shareholders of Tribune.  Another $2.8 billion of the LBO Loans was used to refinance Tribune's pre-existing

---

[2]     The Guarantors are those subsidiaries of Tribune listed on Exhibit B to this Complaint.

senior bank debt, which was already held primarily by the Lead Banks. The refinancing materially harmed Tribune by affording those lenders materially better terms on the new debt than on the pre-existing debt without any corollary benefit to Tribune or its subsidiaries. The refinanced debt bore a higher interest rate than the pre-existing debt and was supported by guarantees from the subsidiary Guarantors that were not previously extant. Another $200 million of the LBO Loans went to the defendants and others for fees in connection with the LBO, again providing no benefit to Tribune or its creditors. For their part, the Guarantors received nothing for their guarantees of billions of dollars in new and refinanced debt of Tribune. Instead, all of the benefit from the LBO Debt went to the major shareholders, who were cashed out at a premium price; Zell, who obtained *de facto* control of Tribune; and the defendants, who received enormous fees for advising Tribune to enter into the LBO and/or for making and arranging the LBO loans, obtained the benefit of new guarantees on such debt, procured increased interest rates on the existing debt, stood to reap very high interest rates on the LBO Debt, and cemented their commercial relationships with Zell.

7.    The Lead Banks structured the LBO knowing that it would add a tremendous amount of debt to Tribune and render it insolvent, but relied on the equity ███████ provided by the PHONES to cover that risk. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

████████████████████████████████████



8.　　Citibank served as the indenture trustee to the PHONES during the same period in which its affiliate, Citigroup, served as the financial advisor to Tribune in connection with the LBO and invested heavily in Tribune's debt. As trustee to the PHONES, Citibank had a fiduciary duty to the holders of the PHONES to strictly observe and enforce the covenants of the Indenture, and a fiduciary duty of the utmost loyalty and good faith, including a duty to refrain from considering or entering into any transaction creating a conflict of interest with its position as indenture trustee. Although Citibank knew, no later than early 2007, of the conflict it had as indenture trustee while its affiliate Citigroup proceeded with the LBO, Citibank did not step down as trustee until 2008, after the completion of the LBO. As trustee to the PHONES, Citibank had a duty to advise and warn holders of the PHONES of the risks inherent in the LBO. Citibank breached this and other fiduciary duties by: 1) failing to enforce the Indenture; 2) permitting its affiliate, Citigroup, to knowingly help structure and fund the LBO in a manner that rendered Tribune insolvent and unable to pay the holders of the PHONES; 3) failing to adequately advise the holders of the PHONES of its conflicted position or the role of Citigroup in the LBO and the known risks inherent in the LBO; and 4) failing to promptly resign as indenture trustee so that a replacement indenture trustee, who would vigorously protect the rights of the PHONES as a result of the LBO, could be appointed.

9.      Defendants' misconduct in structuring and effectuating the LBO, including foisting the LBO Debt upon Tribune and obtaining the related guarantees and stock pledges, in a manner that rendered Tribune insolvent and, ultimately, bankrupt, to the direct detriment and at the expense of the PHONES, mandates equitable subordination of the defendants' claims to those of the PHONES holders. For the same reasons, and as more particularly described below, the claims of all defendants, including JPMCB and MLCC as Administrative Agents, should be disallowed. Further, holders of the PHONES should be awarded damages against Citibank for its breach of fiduciary duties and equitable subordination and damages against the other defendants for aiding and abetting Citibank's breach of its fiduciary duties. Finally, holders of the PHONES should be awarded a constructive trust over any property right, claim, interest, or other thing of value received and obtained by any of the defendants as a consequence of their wrongful conduct described herein.

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) because the claims asserted in this adversary proceeding arise in and/or relate to the above-referenced Chapter 11 bankruptcy cases. This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court by reason of 28 U.S.C. §§ 1408 and 1409 and because the Debtors' bankruptcies, which have been administratively consolidated, are being administered in this Court.

## III.      PARTIES

11.     Plaintiff is Wilmington Trust, in its capacity as Successor Indenture Trustee for the PHONES.

12.    Defendant J.P. Morgan Chase Bank ("JPMCB") is named as a defendant herein individually and as Administrative Agent for the "Senior Credit Facility" as defined below.  As Administrative Agent for the Senior Credit Facility, JP Morgan represents those lenders owning an interest in the loans that comprise the Senior Credit Facility.

13.    Defendant J.P. Morgan Securities, Inc. ("JPMS"), affiliated with JPMCB, served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with JPMCB, "JP Morgan").

14.    Defendant Merrill Lynch Capital Corporation ("MLCC") is named as a defendant herein individually and as Administrative Agent for the $1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Facility"), dated as of December 20, 2007.  As Administrative Agent for the Bridge Facility, MLCC represents the lenders owning an interest in that loan. MLCC also served as Syndication Agent for the Senior Credit Facility and as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility.

15.    Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), an affiliate of  MLCC, acted as financial advisor to Tribune in connection with the LBO (together with MLCC, "Merrill").

16.    Defendant Citicorp North America, Inc ("Citicorp") served as co-documentation agent for the Senior Credit Facility and the Bridge Facility, and is an entity under common control with Citigroup Global Capital Markets Inc. and with Citibank, N.A.   As co-documentation agent, Citicorp materially facilitated the wrongful lending described below. Citicorp also is named as a defendant in its capacity as administrative agent for the preexisting debt paid off in full by the proceeds of the Senior Credit Facility.

17.     Defendant Citibank was the trustee under the PHONES indenture, and is an entity under common control with Citicorp and Citigroup Global Markets, Inc.  Citibank was the indenture trustee to the PHONES from 2002 through 2008, including the time period before, during, and after the LBO was completed.

18.     Defendant Citigroup Global Markets, Inc. ("CMGI"), an entity under common control with, and an affiliate of, Citicorp and Citibank, acted as financial advisor to Tribune in connection with the LBO and served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with Citicorp, "Citigroup").

19.     Defendant Barclays Bank PLC ("Barclays") served as co-documentation agent for the Senior Credit Facility.  As co-documentation agent, Barclays materially facilitated the wrongful lending discussed below.

20.     Defendant Bank of America, N.A. served as co-documentation agent for the Senior Credit Facility and the Bridge Facility.  As co-documentation agent, Bank of America, N.A. materially facilitated the wrongful lending discussed below.

21.     Defendant Banc of America Securities LLC ("BAS"), an entity under common control with Bank of America, N.A., served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with Bank of America, N.A., "Bank of America").

22.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was engaged by Tribune to act as a financial advisor to the Special Committee of the Board of Directors of Tribune in connection with the LBO.  Morgan Stanley also was a lender in the LBO.

## IV.     FACTUAL BACKGROUND

23.     Until its unfortunate demise at the hands of its management and the Lead Banks, Tribune had been known as an innovator and a leader since 1847.  Tribune is the owner of a multitude of media businesses providing newspaper, radio, television, and entertainment products and services to nearly 80% of the households in the United States.  Tribune is divided into two basic business groups: (a) publishing; and (b) broadcasting and entertainment.  The publishing group owns major newspapers and related Internet web sites in many of the most significant markets in the United States, including the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, and the *Hartford Courant* newspapers.  The broadcasting and entertainment group includes numerous radio and television stations in major markets.  In addition, Tribune owns many other prominent media and entertainment properties and interests in other real estate and entertainment properties.  Further, at all relevant times, a subsidiary of Tribune owned the Chicago Cubs major league baseball team.  As of the date Tribune initiated these bankruptcy proceedings, the publishing segment employed approximately 12,000 full-time equivalent employees, and the broadcasting and entertainment segment employed an additional 2,600 full-time equivalent employees.

24.     Until the LBO closed, Tribune was publicly traded with its stock listed on the New York Stock Exchange.

25.     Prior to 2006, Tribune's debt was modest in relation to the size of its business and consisted primarily of publicly traded bonds and subordinated debentures issued during the 1990s.  Before the LBO, the ratio of Tribune's indebtedness to EBITDA was 4.8:1.  After the LBO, it increased to 11.8:1.

26.     Tribune issued its publicly traded bonds between 1992 and 1997. The bonds were in the aggregate amount of $1.26 billion, which were evidenced by unsecured notes with maturity dates ranging between December 8, 2008 and November 2026 (collectively, the "Bond Debt"). Each of the indentures governing the Bond Debt provides that the bonds share *pari passu* in payment priority with all other non-subordinated debt owed by Tribune. The Bond Debt is not, however, guaranteed by any of Tribune's subsidiaries. As of the Petition Date, the outstanding amount of the Bond Debt was approximately $1.3 billion.

27.     In April 1999, Tribune issued the PHONES, a series of subordinated debentures in the aggregate principal amount of $1.2 billion, the trading value of which was linked to the trading value of AOL Time Warner company stock. The indenture in respect to the PHONES contains a clause purporting to subordinate the PHONES' right of payment to all other funded indebtedness of Tribune.

28.     At the time of the LBO, and at the Petition Date, Tribune and its subsidiaries also owed various other debts to trade creditors and others incurred in the ordinary course of business. Claims of Tribune's retirees as of the Petition Date exceed $125 million.

29.     The PHONES, the Bond Debt, and other non-bank debt of Tribune are referred to collectively as the "Non-Bank Debt."

## V.     THE 2006 RECAPITALIZATION

30.     Beginning in late 2005, Tribune's Board of Directors (the "Board") undertook a strategic review of the broadcasting and entertainment sector of Tribune's business and considered possible changes to the structure and ownership of its properties. On or about October 17, 2005, Tribune retained the services of Merrill to assist in this evaluation and approved in advance Merrill's participation in financial transactions that might develop from the

strategic review. Tribune later retained Citigroup to assist in the evaluation as well and provided to Citigroup the same advance approval to participate in financial transactions resulting from the review. Pursuant to their advisory engagements with Tribune, both Merrill and Citigroup were paid millions of dollars in fees. Both Citigroup and Merrill, in addition to reaping huge advisory fees, also participated in the debt offering as lenders and administrative agents.

31.     In May 2006, the Board, with the advice of Merrill and Citigroup, decided to engage in a leveraged recapitalization transaction pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock ("2006 Recapitalization"). At the time, the Chandler Trust Nos. 1 and 2 (together, the "Chandler Trusts"), were among the largest shareholders of Tribune. Representatives of the Chandler Trusts were directors of Tribune during the time leading up to the LBO.

32.     The Chandler Trusts' three representatives on the Board voted against the transaction. Tribune nonetheless proceeded to repurchase 55 million shares in 2006 for a total of nearly $1.8 billion through a public tender offer and a private transaction with the Robert R. McCormick Tribune Foundation and the Cantigny Foundation (together, the "Foundations"). As a result of these share repurchases, the Chandler Trusts became Tribune's largest stockholders. The Foundations continued to be major shareholders as well.

33.     In June 2006, primarily to finance the share repurchases described above, Tribune entered into a credit agreement with Citicorp as administrative agent; MLCC as syndication agent; Bank of America, N.A., Morgan Stanley, and JPMCB as three of the four documentation agents; and CMGI, MLCC, and JPMS as joint lead arrangers and joint book runners. As of December 31, 2006, there was approximately $2.8 billion in debt outstanding under this credit agreement (the "2006 Bank Debt").

34.     On or about June 13, 2006, the Chandler Trusts sent a publicly-filed letter to the Board, stating that the Chandler Trusts would not tender their shares in the leveraged recapitalization, which they stated was ill-advised and hasty. The Chandler Trusts urged the Board to explore other strategic alternatives, including a leveraged buy out. Thereafter, from the summer of 2006 until April 2007, the Chandler Trusts continued to press the Board to take steps that would allow the Chandler Trusts to cash out some or all of their Company shares through a sale or recapitalization of Tribune.

35.     In response to the pressure from the Chandler Trusts, Tribune decided in September 2006 to pursue a sale or recapitalization and formed a special committee of the Board ("Special Committee") to consider and evaluate sale and recapitalization alternatives. Subsequently, in late 2006 and early 2007, Tribune expanded its review to include a possible self-help capitalization of the company and a spin off of its broadcasting business under which Tribune would pay a special dividend of $20 or more per share.

36.     In or around October 2006, Tribune retained Morgan Stanley to act as the financial advisor to the Special Committee. Tribune agreed to, and did, pay Morgan Stanley millions of dollars in fees in that role.

37.     Although Morgan Stanley was the Special Committee's financial advisor, it was Merrill and Citigroup who solicited third parties to express interest in a buyout of Tribune. By October 2006, 17 potential outside purchasers had expressed interest in Tribune. Merrill and Citigroup acted as advisors to Tribune in evaluating these proposals. However, Merrill and Citigroup each had an inherent conflict of interest. If any of the transactions went forward, Merrill and Citigroup were highly likely to participate in financing the transactions and stood to make millions of dollars from such financing. If no transactions took place, they would only

receive smaller advisory fees. Merrill and Citigroup thus had a strong financial incentive to advise Tribune to agree to a sale or recapitalization even if doing so was not in the best interest of Tribune and its pre-existing debt holders, including the PHONES.

38.     Merrill's and Citigroup's inherent conflicts of interest as advisors and potential lenders crystallized as the Zell proposal, described below, moved forward. In addition to receiving millions of dollars in fees, because Zell's proposal called for refinancing the 2006 Bank Debt, to the extent that they held 2006 Bank Debt, Merrill and Citigroup also stood to benefit from increased interest rates and improved security in the form of subsidiary guarantees. They were thus inherently biased in favor of the transaction without regard to whether it was in Tribune's interests or those of pre-existing debt holders, including the PHONES.

39.     Citigroup had another clear conflict of interest – its affiliate, Citibank, was at all relevant times the indenture trustee of the PHONES. In that role, Citibank owed the PHONES holders a fiduciary duty of the utmost loyalty and good faith, including a duty to refrain from benefiting itself or its affiliates at the expense of the PHONES and to refrain from engaging in any transaction which created a conflict of interest. At all relevant times, Citibank was an agent of Citigroup and acting under its direction and on its behalf. Notwithstanding its role as indenture trustee to the PHONES, at no time prior to the completion of the LBO did Citibank resign as trustee, so that an independent trustee, free of conflicts of interest, could be appointed to replace it and protect the interests of the PHONES. Nor did Citibank attempt to stop Citigroup from structuring and ultimately funding the LBO, or advise the holders of the PHONES of its conflicted position or of Citigroup's role and the risks inherent in the LBO.

40.     Tribune recognized its advisors' conflicts and sought to mitigate them through the Special Committee's retention of Morgan Stanley to advise on the transaction. But Morgan

Stanley also suffered from a conflict of interest - it was a documentation agent and one of the lenders on the 2006 Bank Debt.

41.     At the time Morgan Stanley was advising the Special Committee on the LBO, it knew that it would profit from an LBO because its 2006 Bank Debt would be refinanced as part of the LBO at higher interest rates and it would obtain priority over the Non-Bank Debt, including ████████████████████ the PHONES.

## VI.     THE ZELL LBO IS APPROVED AS A SINGLE INTEGRATED TRANSACTION

42.     While many companies had expressed initial interest in Tribune, by February 2007 only two third-party bidders remained interested in Tribune, one of whom was an entity principally owned by Zell, Equity Group Investments, LLC ("EGI"). All other third-party bidders had dropped out. Although market conditions were favorable to leveraged buyouts generally, market interest in the Tribune auction was depressed by severe deterioration in the newspaper industry.

43.     Both remaining third-party bids contemplated highly leveraged transactions financed primarily by enormous loans to be taken on by Tribune. Under both remaining proposals, the bidders' equity contributions would be small in relation to the size of the transactions.

44.     Under the LBO structure Zell proposed, Tribune would increase its total debt load to over $14 billion – more than ten times its projected annual earnings before interest, taxes, depreciation and amortization ("EBITDA") – to buy out the public shareholders and refinance the 2006 Bank Debt.

45.     After this buyout, Tribune would be owned by a newly formed employee stock ownership plan ("ESOP") for Tribune's employees, which afforded certain tax advantages.

Zell's entity, EGI, would invest $315 million and obtain warrants entitling it to buy up to 40% of Tribune. The LBO would also result in the appointment of Zell as Chief Executive Officer and Chairman of the Board. This structure would achieve the two goals of satisfying the large shareholders' demands to be cashed out and vesting control of Tribune in Zell.

46. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ Nonetheless, when Zell increased his offer to $34 per share, the Board, acting with advice from Merrill, Citigroup and Morgan Stanley (through its recommendations to the Special Committee), approved the LBO proposed by Zell at that price at a meeting on April 1, 2007. The Board approved the LBO as a whole, not merely the first step tender offer described *infra*, evidencing the Board's understanding and intent that the LBO was a single integrated transaction.

47. Also on April 1, 2007, the Board approved, and Tribune entered into, a merger agreement ("Merger Agreement") that obligated it to proceed with the LBO by buying all of the publicly owned shares of Tribune. As set out in the Merger Agreement, Tribune agreed to make a tender offer for purchase of approximately one-half of the outstanding shares of Tribune (126,000,000 shares) at a price of $34/share. Total consideration for the tender offer was approximately $4.284 billion. Pursuant to the Merger Agreement, Tribune also contractually committed to a second step of the transaction, in which it would purchase the remaining publicly owned shares of Tribune following regulatory approvals from the Federal Communications Commission ("FCC") required for certain aspects of the LBO, at a price of $34/share. Total consideration for the purchase of the remaining shares was some $4 billion. Tribune therefore

contractually committed on April 1, 2007 to undertake all actions necessary to consummate the LBO in its entirety.

48.     The LBO financing package was initially memorialized in two loan commitment letters, issued by a consortium of the Lead Banks on April 1, 2007 and restated as of April 5, 2007 (the "Loan Commitment Letters"), committing to loan Tribune some $12.233 billion.

49.     A more detailed agreement reflecting the terms of the financing was executed on or about May 17, 2007. This agreement formalized the Lead Banks' agreement to lend up to $8.028 billion for Step One of the LBO (the "Step One Credit Agreement"), which was to close in early June 2007.

50.     The Step One Credit Agreement provided for financing of Step One of the LBO through several different credit facilities: a two-year term facility in the amount of $1.5 billion (the "Tranche X Facility"), a seven-year term facility in the amount of $5.515 billion (the "Tranche B Facility"), a separate seven-year delayed draw facility in the amount of up to $263 million, and a revolving credit facility in the amount of up to $750 million. Those credit facilities are referred to collectively as the "Step One Financing," and the LBO Lenders[3] that participated in them, or that acquired an interest in the loans from the LBO Lenders that originally participated, are referred to as the "Step One Lenders." The Step One Credit Agreement also included the LBO Lenders' agreement to provide $2.105 billion of the financing needed for Step Two of the LBO through an "Incremental Facility" that would become part of

---

[3] The term "LBO Lenders" is defined as all lenders currently, previously, or in the future owning an interest in the loans that comprise the Senior Credit Facility and the Bridge Facility, as these terms are defined in this Complaint, and all lenders that owned such an interest at the time repayments were made on the Senior Credit Facility and the Bridge Facility or at the time the loans comprising the Senior Credit Facility and the Bridge Facility were made. Those lenders currently owning an interest in such loans are bound by the actions of their predecessors in interest with respect to such loans. The identity and interest of all of the LBO Lenders currently, previously, or in the future participating in the Senior Credit Facility and the Bridge Facility are unknown to Wilmington Trust. Wilmington Trust hereby reserves its rights to amend its complaint to add any LBO Lenders as it becomes necessary.

the Tranche B Facility. The Step One Financing and the Incremental Facility, which are senior in payment priority to the Bridge Facility, make up the "Senior Credit Facility."

51.     At all relevant times, consistent with the Merger Agreement and related transactional documents, Tribune viewed and publicly described the LBO as one single integrated transaction occurring in two steps, with the second step occurring later primarily to allow time to obtain the expected approvals from the FCC. Tribune intended at all relevant times to complete the LBO and was obligated, pursuant to the Merger Agreement and otherwise, to do so.

52.     For example, Tribune's April 2, 2007 press release announced that Tribune had entered "a transaction which will result in Tribune going private and Tribune shareholders receiving $34 per share" and that "Shareholders will receive their consideration in a two-stage transaction."

53.



54. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

55.     At the same time as the Merger Agreement, the Chandler Trusts, which held approximately 20% of the outstanding shares, entered into a stock voting agreement in which they committed to support the LBO.  Further, upon information and belief, the McCormick Foundation, which held approximately 13% of the outstanding shares, also committed to support the Merger at the same time.  Thus, shareholders holding 33% of the Tribune's outstanding shares agreed to vote for the Merger at the time it was first announced.  The Chandler Trusts' shares, together with the remaining shares held by the Foundations, would be cashed out at top-dollar at the expense of Tribune and the Pre-LBO creditors.

## VII.    AS THE LBO WAS BEING STRUCTURED, ANALYSTS OBSERVED THAT THE LBO CONTEMPLATED VERY HIGH DEBT FOR A COMPANY IN A DETERIORATING INDUSTRY

56.     While the bid process was moving forward, Tribune's management and members of the Special Committee expressed concern about any deal that would require Tribune to take on such a large amount of debt given the weakening business outlook for newspapers.  Contemporaneous news reports noted that the severe deterioration in the newspaper industry had gotten worse:  For instance, a March 26, 2007 New York Times article reported that "[f]or newspapers, February was the cruelest month . . . [s]o far" because "[r]evenue from advertising was in striking decline . . . compared with February a year ago, and [] generally weaker than

analysts had expected." The New York Times went on to note that "the February results were 'not a blip on the screen'" and that "'[i]t's fundamental, what's going on with newspapers.'" "Mirroring the slide in ad revenue is a long slow decline in circulation." The article noted that newspaper circulation had reached its peak in 1984 and that circulation "losses have accelerated over the last two years."

57.    Independent analysts recognized the risks from the leveraged transaction as contemplated by the Zell LBO in an industry facing extreme pressures. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

58.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

59.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

60. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

61.     Moreover, directly after the LBO was announced, Standard & Poor's cut Tribune's credit rating to BB-minus from BB-plus and left its ratings on review for possible further downgrade if the deal was consummated. Standard & Poor's stated that, if Tribune's shareholders approved the transaction as outlined, it would lower the corporate credit rating to B. Fitch similarly cut Tribune's issuer rating to BB-minus from BB-plus and announced identical downgrades of Tribune's senior unsecured revolving credit facility and its senior unsecured notes. Fitch also said it expected to downgrade further if the transaction proceeded as outlined.

62.     On April 4, 2007, the Wall Street Journal questioned how Tribune would pay its debt after the LBO transaction, stating: "[t]he big question hanging over Tribune's $8.2 billion buyout deal unveiled Monday is this: How do they plan to do that, given that the newspaper industry faces uncertain prospects? Financed almost entirely by debt, the buyout will leave the newspaper and TV concern staggering under more than $12 billion in debt, when existing borrowings are included. **That is about 10 times Tribune's annual cash flow, a ratio several times higher than typically carried by most media businesses**." (Emphasis added). The same article also quoted a Barclays Capital analyst stating, "[w]e think it is possible that Tribune is **leveraged higher than the total assets of the company after taxes**." (Emphasis added).

63.     On April 3, 2007 the Wall Street Journal quoted Barry L. Lucas, an analyst with Gabelli & Co. as stating: "I certainly hope no one else is thinking of doing what Tribune has

done. It's a mess." Further, on April 6, 2007, the New York Times called the LBO "**one of the most absurd deals ever . . . .**"   (Emphasis added).

## VIII.   THE VRC SOLVENCY OPINIONS

64.     Because the LBO was so highly leveraged, Tribune understood that it needed to buy a solvency opinion because of the risks that the LBO would render Tribune insolvent.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

65.     ████████████████████████████████████ Duff & Phelps ("D&P").  D&P subsequently agreed to provide a "viability" opinion to the trustee for the ESOP.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

66.     On or about March 29, 2007, one day before a March 30, 2007 meeting of the Tribune Board, Tribune continued shopping around for a favorable solvency opinion and spoke with Valuation Research Corp. ("VRC").  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

67.    ████████████████████████████████████████████

████████████████████ VRC still took on the engagement from Tribune.

68.    ███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

69.    VRC's engagement letter called for the preparation of solvency opinions throughout the two-step process of taking Tribune private.

70.    VRC viewed Step One and Step Two of the LBO as part of one unified transaction, as that was how the LBO deal was structured and its engagement letter reflected that view.

71.    VRC issued two solvency opinions in connection with Step One of the LBO, one on May 9, 2007, and another on May 24, 2007. The May 9, 2007 and May 24, 2007 opinions analyzed Step One of the LBO in a vacuum as a completely separate transaction without factoring in any effects of Step Two. ████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

72.    When preparing its May opinions, VRC ██████████████████████████████ ████████████████████████████████████████ made no adjustments to reflect Tribune's actual year-to-date financial performance for 2007. ████████████████

█████████████████████████████████████████████████████

73.



74. ███████████████████████████████

███████████████████████████████████

██████████████████████████

75. ███████████████████████████████

███████████████████████████████████

███████

76.     Prior to consummation of Step Two, the Lead Banks became concerned about Tribune's solvency. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████     Nevertheless, the Lead Banks purported to rely upon VRC's opinions even though they, in fact, knew those solvency opinions did not reflect the true financial condition of Tribune.

77.     Notwithstanding all of the available private and public information indicating to Tribune and the defendants that the deal would bankrupt Tribune, they proceeded with the LBO.

## IX.     THE LEAD BANKS FINANCED THE LBO WITH KNOWLEDGE THAT IT WOULD LIKELY LEAD TO TRIBUNE'S INSOLVENCY

78.     The risks that the enormous financing that the proposed LBO required Tribune to incur ($9 billion in new debt), at a time when its business was deteriorating, were obvious to all. Tribune needed to pay the shareholders over $8 billion for their shares, refinance the 2006 Bank Debt, and pay over $200 million in fees to the LBO Lenders and others.  Tribune and the Lead

Banks put together this financing even though they knew or foresaw that the debt Tribune would take on would lead it into bankruptcy.

79.      While Tribune and the Lead Banks worked on the financing of the LBO, Tribune's financial performance worsened each month.  The financial projections on which the LBO was premised were finalized in early February 2007. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

80.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

81.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  The operating profits that

Tribune was counting on to pay interest on the massive debt load imposed by the LBO were disappearing before Tribune and the Lead Banks even finalized the financing.

82.     Nonetheless, Tribune and the Lead Banks pushed ahead. Tribune was driven by its desire to satisfy the demands of its shareholders, including the Chandler Trusts, to be bought out and Zell's desire to control Tribune, and the Lead Banks were driven both by their intent to generate huge fees and the prospect of doing future business with Zell. Motives of self-interest and greed led the Lead Banks to press ahead with the LBO notwithstanding that their own analysis led the Lead Banks to conclude that there was a significant risk of Tribune not being able to shoulder the debts incurred in the LBO and therefore not being able to avoid bankruptcy.

### A. JP Morgan's Knowledge And Participation

83.     JP Morgan was committed to participating in a transaction involving Tribune because JP Morgan stood to earn extraordinary fees. JP Morgan was also eager to build its relationship with Zell, whom JP Morgan considered a source of lucrative business in the future.

84.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

85.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

86.

87.     As part of its role, JP Morgan assisted Zell and Zell's entity, EGI, ▮▮▮▮▮▮ so

that the LBO sponsored by Zell could proceed.

88.     JP Morgan was motivated to assist Zell and EGI in ▮▮▮▮▮▮

▮▮ implementing the LBO plan, at least in large part, by the significant fees it could earn on the

LBO.



89.     JP Morgan recognized both that the LBO could drive Tribune into bankruptcy and that, if bankruptcy occurred, it would be at the expense of the PHONES and other Non-Bank Debt.

90.



91.

92.

93.

94.

95.     Thus, it was readily apparent to JP Morgan that the LBO deal would push Tribune

into bankruptcy and jeopardize the PHONES' right to payment.  JP Morgan also was well aware

that its brazen tactics posed a risk of equitable subordination of its claims in bankruptcy, but that was a risk it was willing to assume. Notwithstanding these risks, JP Morgan proceeded with the LBO.

### B. Citigroup And Citibank's Knowledge And Participation

96. Like JP Morgan, Citigroup was motivated to participate in the LBO by its own self-interest to make money and develop a strong relationship with Zell.

97. Moreover, Citigroup's participation in the LBO posed a conflict with its affiliate, Citibank, who owed fiduciary duties to the PHONES as their indenture trustee. Nonetheless, Citigroup cared more about doing business with Zell and turning a profit than it did about Citibank's fiduciary duty as trustee to the PHONES.

98. Upon information and belief, Citigroup and Citibank knew there was a conflict of interest. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ Nevertheless, Citibank remained as trustee for the PHONES into 2008, until after the LBO closed. Upon information and belief, Citibank recognized that if it did not retain its role as trustee during the course of the LBO, a new independent trustee would be appointed, and, free of conflicts, would protect the PHONES from the crushing debt of the LBO. By remaining as trustee, Citibank did nothing to interfere with the windfall that Citigroup would receive. Further, Citibank sat silent, and failed to inform the holders of the PHONES of its conflicts, or of the involvement of Citigroup, or of the risks inherent in the LBO.

99. Citibank's failure to act, resign or disclose is all the more egregious because it received correspondence from counsel for certain PHONES holders regarding the PHONES'

legal rights pursuant to the Indenture in light of the LBO. Beginning in April 2007, Andrews Kurth LLP ("Andrews") sent a Notice of Default under Section 5.01(4) of the Indenture to Tribune, and so notified Citibank, as trustee. After Tribune failed to remedy the breach, in July 2007, Andrews sent a Notice of Acceleration pursuant to Section 5.02 of the Indenture, again notifying Citibank.

100.    When Tribune again failed to remedy the breach, in August 2007 Andrews sent a letter stating that, by participating in the LBO, Tribune disposed of assets in a manner that was materially disadvantageous to the holders of the PHONES and made Tribune a fundamentally different company with serious credit risk. Andrews further stated that Citibank, as Trustee, should institute proceedings to enforce the PHONES' rights under the Indenture. Citibank ignored the letter, and did nothing.

101.    Thereafter in August 2007, Cede & Co. sent Notices of Default to Tribune and Citibank Agency and Trust on behalf of PHONES holders. Further, Cede & Co. sent Notices of Acceleration to Tribune and Citibank in letters in December 2007. Still, Citibank, as trustee, did nothing.

102.    ██████████████████████████████████████

███████████████████████████████████████████

████████

████████████████████████████████████

███████████████████████

103.    At the same time that Citibank was refusing to take action as indenture trustee for the PHONES, its affiliate, Citigroup was working furiously as a financial advisor to Tribune, while simultaneously trying to ingratiate itself with Zell, to push forward with the LBO. As it

did so, Citigroup knew that the amount of debt incurred in connection with the LBO placed

Tribune in precarious financial condition. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

104. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

105. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

106. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

107.   Notwithstanding its knowledge of the risks caused by the high leverage of the

LBO, and its affiliate Citibank's breaches of fiduciary duty as trustee to the PHONES, Citigroup

advised Tribune to proceed with the LBO, and itself participated in the LBO financing.

### C. Merrill's Knowledge And Participation

108. Like JP Morgan and Citigroup, Merrill was motivated to participate in the LBO by its own economic self-interest and greed. When it became an advisor to Tribune in late 2006, Merrill was conflicted by its role as financial advisor to Tribune and its self-interested desire to do more business with Zell. ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Merrill's interest in doing business with Zell made it support Zell unconditionally, even though Merrill knew that the LBO, as structured, could only be completed at the expense of Tribune's solvency, and jeopardize the claims of the PHONES, and other Non-Bank Debt.

109. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ Merrill realized that the proposed LBO structure would result in excessive leverage████████████████████████

████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████

110. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

111.

112.   Merrill also was interested in increasing the fees it received from Tribune.

Merrill thus saw the LBO as an opportunity to get fees from Tribune, create future business opportunities with Zell and profit from participating in the financing of the LBO, so it proceeded despite the risks.

113.

Notwithstanding its clear concern that Tribune would be rendered insolvent, Merrill proceeded, believing that it would still profit, and that was its only concern.

### D.   Bank of America's Knowledge And Participation

114.   Upon information and belief, Bank of America was motivated by the same economic self-interest and greed to participate in the LBO and had the same concerns regarding the LBO's impact on Tribune's solvency as did the other Lead Banks.

115.

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Upon information and belief, Bank of America's concerns about the debt incurred as a result of the LBO led it to seek to reduce its exposure to that risk.

## X. THE LBO WAS STRUCTURED TO FAVOR THE LEAD BANKS IN ANTICIPATION OF A BANKRUPTCY FOLLOWING THE LBO

116. While Step One and Step Two of the LBO were being implemented, the Lead Banks knew, at all relevant times, that there was an extremely high risk that Tribune would have to file for bankruptcy as a result of the LBO Debt. Thus, the only way the Lead Banks were willing to arrange and finance the LBO was if they could effectively subordinate the Non-Bank Debt and maintain the contractual subordination of the PHONES to the LBO Debt.

117. The Lead Banks sought to subordinate the Non-Bank Debt and take advantage of the contractual subordination of the PHONES by insisting that the Guarantors guarantee all of the LBO Debt, including the amounts used to refinance the 2006 Bank Debt (the "Step One Guarantee"). By obtaining the Step One Guarantee, the Lead Banks intended to obtain priority to ensure that, in the event of a bankruptcy, the first losses would fall disproportionately on the PHONES and other Non-Bank Debt.

118. The Step One Credit Agreement required the Guarantors to jointly and severally guarantee the full amount of the Step One Financing, plus the amount of future disbursements contemplated to take place in connection with the Step Two Financing. By executing the Step One Guarantee, each of the Guarantors became jointly and severally liable for up to $10.133 billion of debt, an amount far exceeding the net worth as of June 4, 2007 of each individual Guarantor and of all Guarantors collectively.

119.  The Guarantors did not receive anything of value in exchange for the Step One Guarantee.

120.  The Lead Banks also took other steps that were intended to make it more difficult for the holders of the PHONES and other Non-Bank Debt to share equitably with the new LBO debt in the event of a bankruptcy. Those steps included the creation of two new subsidiaries of Tribune, Tribune Broadcasting Holdco, LLC ("Holdco") and Tribune Finance, LLC ("Finance"). Holdco became the holding company for Tribune's broadcasting subsidiaries through Tribune's transfer to Holdco of the stock of the previous broadcasting holding company, Tribune Broadcasting Company.  Finance became a creditor of Tribune's principal publishing subsidiaries through a complex circle of transactions in which some $3 billion of the Step One Financing was first distributed by Tribune to Finance, then loaned by Finance to the publishing subsidiaries and finally returned to Tribune from the publishing subsidiaries by means of dividends, so that the $3 billion ended up right where it had started. The only difference was that now the publishing subsidiaries were obligated on substantial intercompany obligations in favor of Finance.

121.  Holdco and Finance are among the Guarantors of the LBO Debt. Tribune also pledged its stock in Holdco and Finance to further secure the LBO Debt (the "Pledge").

122.  Tribune and the Lead Banks agreed to the creation of Holdco and Finance and the complex related transactions in large part as a pretext to hinder the ability of holders of the PHONES and other Non-Bank Debt to challenge the guarantees as fraudulent in the event of a bankruptcy. As newly created entities, Holdco and Finance had no pre-existing creditors, unlike the other Guarantors. The Lead Banks apparently believed, incorrectly, that this fact would make it more difficult for the holders of the PHONES and other Non-Bank Debt to challenge the

36

Holdco and Finance guarantees as fraudulent. Holdco and Finance effectively controlled all of the value of the other Guarantors through Holdco's ownership of the broadcasting subsidiaries and Finance's loans to the publishing subsidiaries. Thus, if Tribune went into bankruptcy and the PHONES and other Non-Bank Debt successfully challenged as fraudulent the guarantees of all the Guarantors except for Holdco and Finance, the Lead Banks believed the value of the other Guarantors would still be diverted to the LBO Lenders by way of the guarantees from Holdco and Finance.

123.     On or about June 4, 2007, Tribune closed the tender offer for 126,000,000 shares. The tender offer was heavily oversubscribed. Approximately 224,000,000 shares, or 92% of the total shares outstanding, were tendered.. Pursuant to the terms of the tender offer, Tribune purchased the 126,000,000 shares it had tendered for on a pro rata basis from the shares tendered.

124.     The Step One Financing also closed on June 4, 2007, and $7.015 billion of loan proceeds was disbursed as follows: $4.284 billion was paid out to shareholders; $2.534 billion was paid to Citicorp as administrative agent for the 2006 Bank Debt to pay it off in full; and hundreds of millions of dollars were paid out for fees, costs, and expenses associated with the LBO.

125.     In order to obtain the Step One Financing, Tribune had to increase the interest rate on the Tranche B Facility by one-half point above what had been initially contemplated and carve out of the Tranche B Facility a $1.5 billion Tranche X Facility with a shorter, two-year term. Half of the Tranche X principal, $750 million, was due eighteen months after the initial draw.

126.    Tribune's financial performance, particularly in the publishing side of its business, continued to fall far below the February 2007 projections after the Step One Financing closed on June 4, 2007. In part, this was due to the continuing industry-wide decline in advertising and circulation that had begun, and was well known, prior to the Step One closing.

127.    Tribune obtained the necessary regulatory approvals from the FCC on November 30, 2007. Step Two closed on December 20, 2007, triggering the conversion of the remaining outstanding shares of Tribune to cash at $34 per share, as required in the Merger Agreement.

128.    As the completion of Step Two of the LBO approached, market skepticism of the LBO continued unabated. For example, on November 2, 2007, just over a month before the Second Step closed, a Lehman Brothers' Newspaper Valuation and Stock Scorecard stated the following: "Should the Tribune privatization deal break and not occur, we believe that the fair value on the stock, if it were to remain and ongoing public entity, would be significantly less than the current stock price. Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share based on our detailed sum-of-the-parts analysis..."

129.    On December 20, 2007, the date Step Two closed, Goldman Sachs issued a Company Update entitled "Good-bye and good luck" in which it stated:

> The company starts life as a private entity with roughly $13 billion in debt . . . the transaction leaves little room for error, particularly given the extremely challenging industry backdrop. The company could potentially face a liquidity crunch fairly quickly if the ad revenue trends of 2007 . . . persist into 2008 and beyond. Mr. Zell and team clearly have their work cut out for them . . . Tribune's

$34 go-private price represents . . . [a] very rich valuation in the
context of the cyclical and secular challenges facing the industry.

130.  Zell himself was quoted in Business Week as calling the transaction a "mistake"

and by Bloomberg News as calling the LBO the "deal from hell."

131.  Randy Michaels, the Chief Operating Officer installed by Zell, also was quoted as

stating, "[a]n animal with his leg caught in a trap will chew it off . . . At the moment, we are

doing some leg chewing."

132.  The financing for Step Two had been committed by the Lead Banks in the

Commitment Letters and consisted of two facilities:  the Incremental Facility of $2.105 billion

and up to $2.1 billion in the Bridge Facility (together, the "Step Two Financing").  The

Incremental Facility funding was provided through a series of "Increase Joinders" executed on or

about December 20, 2007, by which various LBO Lenders added this funding to the Tranche B

Facility originated in the Step One Financing.  Because of this structure, the Incremental Facility

loan was accorded the priority of the Tranche B Facility and was covered by the Step One

Guarantee.

133.  The Lead Banks' concerns about the continued deterioration of Tribune's

financial performance led to negotiations regarding the amount of the Step Two Financing.

These negotiations led to an agreement between Tribune and the Lead Banks to reduce the

amount of the Bridge Facility from $2.1 billion to $1.6 billion.  The result of this reduction was

to reduce the exposure of the LBO Lenders on the highest risk portion of the LBO Debt.

134.  On December 20, 2007, the day Step Two closed, Tribune issued notes in favor of

JPMCB as Administrative Agent for the Senior Credit Facility with respect to the Incremental

Facility and in favor of MLCC as Administrative Agent for the Bridge Facility.

135.     At the same time, the Guarantors executed a separate guarantee of the $1.6 billion Bridge Facility (the "Step Two Guarantee"), subordinate to the Step One Guarantee, by which the Guarantors jointly and severally unconditionally guaranteed repayment of the Bridge Facility. By executing the Step Two Guarantee, the Guarantors increased their obligation to $11.733 billion. As of December 20, 2007, the amount of indebtedness guaranteed by the Step Two Guarantee far exceeded the net worth of Tribune, each individual Guarantor, and of all Guarantors collectively.

136.     Furthermore, in connection with and at the same time as the Guarantors executed the Step Two Guarantee, the Guarantors executed two Indemnity, Subrogation and Contribution Agreements (the "Subordination Agreements"), one for Step One and one for Step Two. The Subordination Agreement respecting the Step One Financing was executed by the Guarantors six months after the Step One Financing transaction as an attachment to the Increase Joinders executed by certain lenders and Tribune for the funding of the Incremental Facility. It had the effect of subordinating indemnity, subrogation, and/or contribution claims from a Guarantor and Tribune or between or among Guarantors to the claims of the Step One Lenders. The Subordination Agreement respecting the Step Two Financing was executed by the Guarantors at the time of the Step Two Financing and subordinated to the Bridge Facility all of the Guarantors' rights to assert indemnity, subrogation, and/or contribution claims such Guarantors then had or thereafter acquired against Tribune or other Guarantors. The effect of the Subordination Agreements was to divert additional value in the Guarantors away from PHONES and other Non-Bank Debt in the event of non-payment by Tribune of the debt incurred in the Step One or Step Two Financings and thereby to reduce the equity value of the Guarantors available to Tribune or the PHONES and other Non-Bank Debt.

137.     Thus, in connection with the Step Two Financing, Tribune and the Guarantors became liable for the additional sum of $3.705 billion, which was used entirely to complete the purchase from the remaining shareholders of 117,115,055 shares of stock at $34 per share for a total of $3,981,911,860.

138.     Once again, the Guarantors received nothing in exchange for the Step Two Guarantee.

139.     In conjunction with the closings of the Step One and Step Two Financings (together, the "LBO Financing"), over $200 million in fees were paid to the defendants. The defendants were motivated to make the LBO Loans by the prospect of earning these substantial fees and because they intended to substantially limit their exposure on the underlying credit by syndicating and selling the majority of the LBO Debt to third-party financial institutions.

## XI.     PRE-BANKRUPTCY PAYMENTS

140.     After completion of the Step One Financing and prior to the initiation of the bankruptcy on December 8, 2008, Tribune paid to JPMCB, as Administrative Agent for the Senior Credit Facility, and MLCC, as Administrative Agent for the Bridge Facility a total of approximately $1.98 billion, consisting of over $900 million of interest and over $1.078 billion of principal. Of the total repayments, approximately $1.73 billion applied to the Step One Financing and over $255 million applied to the Step Two Financing.

141.     Of these repayments, Tribune paid about $166.5 million within the 90 days preceding the Petition Date.

## XII.     BANKRUPTCY PETITION FILING

142.     Tribune's financial performance after the LBO closed was consistently far below Tribune's February 2007 projections. The inevitable bankruptcy that the Lead Banks had

contemplated before the Step One Financing became reality as Tribune struggled under the weight of the enormous debt taken on to buy out the shareholders and pay off the 2006 Bank Debt. By late 2008, Tribune had begun active planning for a bankruptcy filing. Not surprisingly, given the financing structure designed to impose the first losses on the Non-Bank Debt, an impending payment due on the Bond Debt precipitated the filing.

143. The Bond Debt included a series of bonds issued in 1997 which were due to mature on December 8, 2008, when Tribune would be obligated to make a principal payment of $69,500,000. Recognizing that a payment of that magnitude would affect the funds available for repayment of the LBO Debt, ███████████████████████████████████ ███████████████████████ and the Board and recommended the initiation of these bankruptcy proceedings to avoid having to make the $69,500,000 payment to the holders of the Bond Debt. Upon approval of the Board, and after consultation with the LBO Lenders, Tribune and 110 of its affiliates filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date.

## XIII. THE CLAIMS OF THE AGENTS

144. JPMCB and MLCC, as Administrative Agents for the Senior Credit Facility and the Bridge Facility, respectively, each filed proofs of claim in the bankruptcy case of the Tribune Company based on claims arising under the Senior Credit Facility and the Bridge Facility, respectively. JPMCB, as Administrative Agent for the Senior Credit Facility, also filed proofs of claim in each of the bankruptcy cases of the Debtors who are obligated on the Step One Guarantee or the Step Two Guarantee. All claims filed by JPMCB and MLCC are referred to collectively as the "Bank Claims."

## COUNT ONE

## EQUITABLE SUBORDINATION AGAINST ALL DEFENDANTS

145.    Plaintiff incorporates by reference paragraphs 1 - 144 of this Complaint as if set forth again in full.

146.    The defendants engaged in a pattern of egregious misconduct to enrich themselves at the expense of the PHONES by causing the Debtors to enter into the LBO, to incur the obligations, and to provide liens and guarantees associated therewith, all of which were incurred, made or effectuated with actual intent to hinder, delay or defraud the PHONES.

147.    Alternatively, in exchange for such obligations, liens and guarantees, the Debtors received less than reasonably equivalent value, were rendered insolvent, were engaged in a business or transaction, or were about to engage in a business or transaction for which the property remaining with the Debtors was unreasonably small capital, or intended to incur or reasonably believed it would incur debts beyond the Debtors' ability to pay as they became due.

148.    The defendants developed, and caused the Debtors to implement, the scheme that effectively elevated the priority of the 2006 Bank Debt and expanded the size of the first-priority debt so that the PHONES and other pre-LBO debt of Tribune would not be repaid in the likely event of the Debtors' subsequent failure and insolvency.

149.    To this end, pursuant to the Merger Agreement executed April 1, 2007, the First Step Credit Agreement executed on May 17, 2007, and the Second Step Credit Agreement executed on December 20, 2007 (collectively, the "LBO Agreements"), Tribune executed certain promissory notes in an aggregate amount exceeding $11.7 billion in connection with the financing for the LBO (the "LBO Notes").

150. Pursuant to the LBO Agreements, the Guarantors executed the unconditional Step One Guarantee and Step Two Guarantee (together, the "LBO Guarantees") in favor of the LBO Lenders. By the LBO Guarantees, the Guarantors purported to guarantee jointly and severally the full and complete payment of the obligations incurred by Tribune in the LBO Loans. The LBO Notes and LBO Guarantees together are referred to as the "LBO Obligations."

151. The Debtors did not receive reasonably equivalent value in exchange for incurring the LBO Obligations. Most of the money advanced in connection with the LBO Loans was applied to purchase outstanding shares of Tribune's stock from shareholders pursuant to the tender offer that closed on June 4, 2007 and the Merger that closed on December 20, 2007. Through their active participation described herein, the defendants aided and abetted such fraudulent transfers.

152. At the time each of the LBO Obligations were incurred, taking into consideration the integrated LBO as a whole, Tribune's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of Tribune's businesses, and the fair value of its assets and liabilities, the Debtors were insolvent, or became insolvent as a result of incurring such LBO Obligations.

153. The defendants were aware prior to the closing of the Step One Financing that the Debtors would be rendered insolvent by the LBO.

154. In connection with the LBO Financing, the Debtors made a transfer of an interest of the Debtors in property of $2,534,437,415.56 to Citicorp as Administrative Agent for the 2006 Bank Debt to satisfy that debt in full (the "2006 Repayment").

155. In connection with the LBO, the Debtors transferred or caused to be transferred an interest of the Debtors in property to defendants or to parties acting on their behalf over $200

million representing loan commitment and other financial accommodation fees for the LBO Financing (the "LBO Fees").

156.    The Guarantors executed the LBO Guarantees on behalf of and for the benefit of Tribune, an affiliate and parent of each of the Guarantors.

157.    The Guarantors received no value whatsoever for executing the LBO Guarantees.

158.    The Guarantors had not been obligated on the 2006 Bank Debt.

159.    The total amount of the LBO Notes greatly exceeded the net worth of each of the Guarantors.

160.    The Debtors and the defendants knew that the Debtors were incurring debt as a result of the LBO beyond the Debtors' means to repay, given the declining newspaper business.

161.    The defendants would not have entered into the Commitment Letters or arranged the LBO Financing in the amount of the LBO Notes without the Guarantees.

162.    The Guarantees effectively elevated the 2006 Bank Debt from unsecured debt to first-priority debt at Tribune level by making the LBO Notes structurally superior to all other debt of Tribune, including that of the PHONES.

163.    There was no legitimate corporate purpose for the creation of Holdco and Finance.  The sole purpose of their creation as new subsidiaries of Tribune was to become Guarantors that had no other debt.  Holdco and Finance were created, at least in part, to consolidate the priority of the Notes over all other debt of Tribune, including that of the PHONES.

164.    There was no legitimate corporate purpose for having certain Guarantors incur an aggregate of $3 billion in intercompany notes to Finance through a circular transaction with Tribune.  The sole purpose of the circular transaction was to create value in Finance, which other

than the intercompany notes had no assets and no purpose. The circular transaction was intended, at least in part, to consolidate the priority of the Notes over all other debt of Tribune, including that of the PHONES.

165. By obtaining the LBO Guarantees from the Guarantors, the defendants were able to ensure that the first losses from any bankruptcy would fall primarily on the holders of the PHONES and other Non-Bank Debt of Tribune. The defendants took further steps to hinder recoveries by the PHONES, including the creation of Holdco and Finance and the transactions relating to those entities that sought to divert value away from the PHONES.

166. Each of the defendants Citigroup, Merrill, and Morgan Stanley acted as advisors to Tribune, had access to insider information, and were in a position to and did exercise influence over Tribune's Board.

167. The defendants earned millions of dollars in fees for such advice and for providing the financing and were able to increase the interest rates on, and improve their security with respect to, the 2006 Bank Debt.

168. The misconduct of the defendants described herein was inequitable and resulted in injury to the holders of the PHONES by depriving them of the equity in the Guarantors that existed prior to the LBO as a source of repayment of their debt.

169. Equitable subordination of the claims of the defendants to the claims of the PHONES is consistent with the provisions of the Bankruptcy Code.

WHEREFORE, all liens securing the Bank Claims must be transferred to Tribune's estate pursuant to Bankruptcy Code Section 510(c)(2) and all Bank Claims and all other claims of defendants against Tribune must be equitably subordinated to the Claims of the PHONES pursuant to Bankruptcy Code Section 510(c)(1).

## COUNT TWO

### DISALLOWANCE OF DEFENDANTS' CLAIMS AGAINST DEBTORS

170.    Plaintiff incorporates by reference paragraphs 1 - 169 of this Complaint as if set forth again in full.

171.    As a party in interest, Wilmington Trust objects to all claims of the defendants.

172.    The defendants received transfers, including cash, liens and guarantees, which are avoidable under the Bankruptcy Code.  As such, the defendants are transferees holding property recoverable to the estates, and they have received other avoidable transfers, which they have not paid or turned over.  Thus, pursuant to Bankruptcy Code Section 502, all of defendants' claims must be disallowed.

173.    Furthermore, the defendants: (1) are guilty of conduct involving unconscionability and bad faith; (2) directly related to the Bank Claims and all other defendant claims asserted against the Debtors' estates; (3) that harmed holders of the PHONES; and (4) affect the balance of equities such that all of defendants' claims  against any Debtor must be disallowed as a result of the defendants' "unclean hands."

WHEREFORE, all Bank Claims and all other defendant claims against any Debtor must be disallowed until the PHONES are paid in full.

## COUNT THREE

### BREACH OF FIDUCIARY DUTY AGAINST CITIBANK

174.    Plaintiff incorporates by reference paragraphs 1 - 173 of this Complaint as if set forth again in full.

175.    During the time that the LBO was being negotiated and implemented, Citibank was the trustee to the PHONES and acted at the direction of, as an agent of and on behalf of Citigroup.

47

176.    Citigroup acted as an advisor to Tribune with respect to the auction and the LBO and, as a result, had access to inside information and earned millions of dollars in fees for such advice and for providing the LBO Financing.

177.    By obtaining refinancing of the 2006 Bank Debt and participating in the LBO Debt, Citigroup was able to increase the interest rate and improve the security with respect to the money it had loaned to Tribune.

178.    At the time of the LBO, Citigroup knew that the LBO would render Tribune insolvent, and that the greatest risk of that insolvency would be borne by the holders of the PHONES.

179.    While it was trustee of the PHONES, Citibank knew of the activities of Citigroup in connection with the LBO.

180.    Notwithstanding its knowledge and awareness of Citigroup's activities in connection with the LBO, Citibank did not resign as trustee until the LBO was completed, thereby preventing an independent trustee from replacing it, did not prevent its affiliate Citigroup from structuring and financing the LBO in a manner that rendered Tribune insolvent and unable to pay the PHONES, and did not adequately advise the holders of the PHONES of its conflicts or the role of Citigroup and the risks inherent in the LBO.

181.    By its acts and omissions as aforesaid, Citibank breached its fiduciary duty as trustee of the PHONES.  The PHONES were harmed as a result.

WHEREFORE, Citibank breached its fiduciary duty to the PHONES by its involvement through its agent in a self-interested transaction that clearly conflicted with the PHONES' interests and in breach and violation of covenants of the indenture for which it was trustee and as a result of which the PHONES sustained damages, in an amount to be proven at trial.

## COUNT FOUR

### AIDING AND ABETTING CITIBANK'S BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS CMGI, CITICORP, JPMS, JPMCB, MORGAN STANLEY, MLCC, MERRILL LYNCH, BARCLAYS, BANK OF AMERICA AND BAS

182. Plaintiff incorporates by reference paragraphs 1 - 181 of this Complaint as if set forth again in full.

183. The defendants each were well aware of Citibank's role as indenture trustee of the PHONES.

184. The defendants also were well aware of Citigroup's role as financial adviser to Tribune in the LBO and other involvement in the LBO.

185. Each of the defendants knew that the LBO would result in Tribune's insolvency and that the brunt of that insolvency would fall first upon the holders of the PHONES.

186. Each of the defendants knew, or should have known, that Citibank's failure to resign as trustee and/or failure to act to prevent Citigroup and the other defendants from proceeding with the LBO, would constitute a breach by Citibank of its fiduciary duty.

187. Notwithstanding the defendants' knowledge, each of them proceeded to structure and participate in the LBO, and engage in the activities set forth herein, thereby aiding and abetting Citibank's breach of fiduciary duty and caused the PHONES harm as a result.

WHEREFORE, as a result of aiding and abetting defendant Citibank's breach of its fiduciary duty, each of said defendants' claims against Tribune should be equitably subordinated to the claims of the PHONES and each are liable for all damages caused to the PHONES in an amount to be proven at trial.

## COUNT IV

## CONSTRUCTIVE TRUST/UNJUST ENRICHMENT

188.     Plaintiff incorporates by reference paragraphs 1 - 187 of this Complaint as if set forth again in full.

189.     As a consequence of the wrongful and inequitable conduct of defendants as described herein, those defendants were able to and did obtain property in the form of obligations, notes, and guarantees from Tribune and its various subsidiaries, all to the detriment of the holders of the PHONES.

190.     As indenture trustee to the PHONES, Citibank had a fiduciary duty of the utmost good faith and loyalty towards holders of the PHONES, but by its acts and omissions described herein, Citibank breached these fiduciary duties.

191.     As a consequence of the other defendants aiding and abetting Citibank's breach of fiduciary duty, prior to commencement of the Debtors' cases, those defendants were able to and did obtain property in the form of obligations, notes, and guarantees from Tribune and its various subsidiaries, all to the detriment of the holders of the PHONES.

WHEREFORE, under the aforesaid circumstances, it would be inequitable and unjust for any of the defendants to retain the property unlawfully obtained from Tribune and its subsidiaries to the detriment of holders of the PHONES. Accordingly, a constructive trust should be imposed over the claims, rights, or other legal interests of the defendants in and to Tribune and/or any of its subsidiaries or property and they should be required to deliver such property to the PHONES, until the PHONES are paid in full.

## **PRAYER FOR RELIEF**

Plaintiff requests judgment and relief as follows:

1. A transfer to the Tribune estate of all liens securing the Bank Claims and the equitable subordination of all Bank Claims and all other claims of defendants against Tribune to the claims of the PHONES;

2. Disallowance of all Bank Claims and all other claims of defendants against Debtors until the claims of the PHONES are paid in full;

3. An award of damages;

4. The imposition of a constructive trust on all estate distributions for the benefit of holders of the PHONES until the PHONES are paid in full; and

5. Such other and further relief as this Court deems just and proper.

SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

Dated: March 4, 2010

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:    _/s/ Jennifer R. Hoover_
Jennifer R. Hoover, Esquire (No. 5111)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010 (telephone)
T: (302) 442-7010
jhoover@beneschlaw.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Martin S. Siegel, Esq.
Seven Times Square
New York, New York 10036
T: (212) 209-4800

William M. Dolan III, Esq.
Brown Rudnick LLP
121 South Main Street
Providence, RI 02903
T: (401) 276-2600

*Counsel to Wilmington Trust Company, as Successor Indenture Trustee*

EXHIBIT A

The Debtors in these Chapter 11 Cases, are: Tribune Company, 435; Production Company; 5800 Sunset Productions Inc.; Baltimore Newspaper Networks, Inc.; California Community News Corporation; Candle Holdings Corporation; Channel 20, Inc.; Channel 39, Inc.; Channel 40, Inc.; Chicago Avenue Construction Company; Chicago National League Ball Club, LLC n/k/a Tribune CNLBC, LLC; Chicago River Production Company; Chicago Tribune Company; Chicago Tribune Newspapers, Inc.; Chicago Tribune Press Service, Inc.; Chicagoland Microwave Licensee, Inc.; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Direct Mail Associates, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; forsalebyowner.com corp; ForSalebyOwner.com Referral Services, LLC; Fortify Holdings Corporation; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; GreenCo, Inc.; Heart & Crown Advertising. Inc.; Homeowners Realty, Inc.; Homestead Publishing Co.; Hay, LLC Hoy Publications, LLC; InsertCo, Inc.; Internet Foreclosure Service. Inc.; JuliusAir Company, LLC; JuliusAir Company II, LLC; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; Los Angeles Times International, Ltd.; Los Angeles Times Newspapers, Inc.; Magic T Music Publishing Company; NBBF, LLC; Neocomm. Inc.; New Mass. Media, Inc.; New River Center Maintenance Association, Inc.; Newscom Services, Inc.; Newspaper Readers Agency, Inc.; North Michigan Production Company; North Orange Avenue Properties, Inc.; OakBrook Productions, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Publishers Forest Products Co. of Washington; Sentinel Communication News Ventures, Inc.; Shepard's Inc.; Signs of Distinction, Inc.; Southern Connecticut Newspapers. Inc.; Star Community Publishing Group, LLC;

Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; The Hartford Courant Company; The Morning Call, Inc.; The Other Company LLC; Times Mirror Land and Timber Company; Times Mirror Payroll Processing Company, Inc.; Times Mirror Services Company, Inc.; TMLH 2. Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Towering T Music Publishing Company; Tribune Broadcast Holdings. Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune Broadcasting News Network, Inc.; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Entertainment Production Company; Tribune Finance, LLC; Tribune Finance Service Center, Inc.; Tribune License, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune Network Holdings Company; Tribune New York Newspaper Holdings, LLC; Tribune News, Inc.; Tribune Publishing Company; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; ValuMail, Inc.; Virginia Community Shoppers, LLC; Virginia Gazette Companies, LLC; WATL, LLC; WCWN LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WLVI Inc.; WPIX. Inc.; and WTXX Inc.; The Debtors' Corporate Headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## EXHIBIT B

The Guarantors providing guarantees are: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC n/k/a Tribune CNLBC, LLC; Chicago Tribune Company, Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com Corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Boy Publications, LLC; Internet Foreclosure Service, Inc.; KIAI-I Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications, LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS 1, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX. Inc.; and WTXX Inc.

SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

# 8243736 v17 - BROMBEKS - 027213/0008